FREDERICK HOWCROFT *vs.* CITY OF PEABODY & others.[1]

No. 98-P-2151.

Essex. December 11, 2000. - May 17, 2001.

Present: BROWN, GILLERMAN, & DUFFLY, JJ.

*Civil Rights*, Availability of remedy, Immunity of public official. *Public Employment*, Police. *Constitutional Law*, Freedom of speech and press. *Massachusetts Civil Rights Act. Federal Civil Rights Act. Emotional Distress. Contract*, Interference with contractual relations.

Discussion of foundational principles underlying the balancing of the interests of a public employee as a citizen commenting on matters of public concern and the State, as employer, in promoting the efficiency of public services. [583-585]

In an action by a police officer against a city and several other police officers seeking damages and other relief under 42 U.S.C. § 1983 for violations of rights secured him by the First Amendment to the United States Constitution, the record in summary judgment proceedings showed that the plaintiff, by expressing his concern about smoking in the city's police station, had exercised a constitutionally protected right to speak on a matter of public concern, and that the passage of G. L. c. 270, § 22, a public health statute designed to protect against the hazards of smoking tobacco, was ignored by the defendants, who chose to retaliate by intimidation and penalties as part of a deliberate effort to suppress the plaintiff's speech; consequently, it was error to allow summary judgment in favor of the defendants on the plaintiff's § 1983 claim, where there remained a genuine issue of material fact whether the defendants responded to the plaintiff's concerns on a matter of public concern by retaliation and attempts to intimidate him. [585-591]

In an action by a police officer against a city and several police officers on a claim pursuant to G. L. c. 12, §§ 11H, 11I, the Massachusetts Civil Rights Act, summary judgment was properly entered in favor of the city, where the city was not a "person" covered by G. L. c. 12, §§ 11H, 11I, and in favor of the individual defendants in their official capacities; however, it was error to allow summary judgment in favor of the defendants in their individual capacities, absent their showing that they would be entitled to judgment on this claim as a matter of law. [591-595]

[1]Robert L. Champagne, individually and in his capacity as the chief of police of the city of Peabody, John A. McCorry, individually and in his capacity as a lieutenant in the Peabody police department, and Milton Cottrell, individually and in his capacity as a captain in the Peabody police department.

There was no basis at the summary judgment stage of proceedings under Federal and State civil rights acts to conclude that the defendants were entitled to qualified immunity from liability. [595]

Claims for intentional infliction of emotional distress against a city and several of its employees in their official capacities were properly dismissed pursuant to G. L. c. 258, § 10(*c*), the Massachusetts Tort Claims Act [596]; however, the same claims against the employees in their official capacities were not barred by governmental immunity and, where the record in summary judgment proceedings reasonably supported the elements of the claims, they were entitled to go to the jury [596].

Summary judgment entered in favor of individual defendants in their individual capacities on claims for interference with contract or advantageous relations was improper, where a jury could have reasonably found either that the defendants had used improper means or that they had acted out of an improper motive. [597]

CIVIL ACTION commenced in the Superior Court Department on February 21, 1990.

The case was heard by *Peter F. Brady*, J., on motions for summary judgment.

*J. Michael Conley* (*Edward L. Sweda* with him) for the plaintiff.

*Lawrence J. O'Keefe*, City Solicitor (*Jonathan Blodgett & Austin Joyce* with him) for City of Peabody & others.

GILLERMAN, J. The plaintiff Frederick Howcroft, formerly a police officer employed by the city of Peabody, brought this action against the city of Peabody and several Peabody police officers, claiming principally that his First Amendment right to speak out on a matter of public interest had been infringed by the retaliatory acts of the defendants. See *Pickering* v. *Board of Educ.*, 391 U.S. 563, 568 (1968); *Kennedy* v. *Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 365-366 (5th Cir. 2000). Howcroft's concern was smoking in public buildings, in this case, the Peabody police station. On January 14, 1988, the Governor approved a comprehensive statute devoted to this subject, which, in part, prohibited smoking in public places including

"any public elevator, supermarket or retail food outlet, in or upon any public mass transit conveyances or indoor platform or enclosed outdoor platform, at any open meeting of a governmental body . . . [or] in any courthouse,

school, college, university, museum, library, train, airplane, waiting area of an airport, waiting area of a health care facility . . . group child care center, school-aged day care center, or family day care center . . . *or in any public building,* except in an area which has specifically been designated as a smoking area. An area shall be designated as a smoking area only if nonsmoking areas of sufficient size and capacity are available to accommodate nonsmokers."[2] (Emphasis supplied.)

G. L. c. 270, § 22, inserted by St. 1987, c. 759, § 3.

Two days earlier, the Governor had approved a statute providing that after January 1, 1988,

"no person who smokes any tobacco product shall be eligible for appointment as a police officer or firefighter in a city or town and no person so appointed after said date shall continue in such office or position if such person thereafter smokes any tobacco products. The personnel administrator shall promulgate regulations for the implementation of this section."

G. L. c. 41, § 101A, inserted by St. 1987, c. 697, § 117.

Regulations promulgated by the personnel administrator on October 6, 1988, interpreted the prohibition to include "all time off the job as well as all time on the job." *Plymouth* v. *Civil Serv. Commn.,* 426 Mass. 1, 3 (1997). We discuss this latter statute in more detail at note 19, and related text, *infra.*

In his verified amended complaint, Howcroft alleged that the defendants violated his Federal and State civil rights and, in addition, that they intentionally inflicted emotional distress and intentionally interfered with his contractual and/or advantageous relations. The Superior Court allowed the defendants' motions

---

[2]Section 22 also provides that "[a]ny person aggrieved by the willful failure or refusal to comply with any provisions of this section in any public building *may complain in writing to the head of such department or agency occupying the area wherein such violation occurs. Such agency or department head shall respond, in writing,* within fifteen days to the complainant that he has inspected the area described in the complaint and has enforced the provisions of this section. Said agency or department head *shall file a copy of the original complaint and his response thereto with the department of public health.*" (Emphasis supplied.)

for summary judgment on all counts and Howcroft appealed.[3] We reverse in part and affirm in part.

The relevant facts appearing in the summary judgment materials[4] extend over a period of more than five years. We summarize these materials, which we view in the light most favorable to Howcroft, and we draw therefrom all reasonable inferences in his favor. See *Douillard* v. *LMR, Inc.*, 433 Mass. 162, 163 (2001). The dominant (but not exclusive) issue is whether, as the defendants[5] argue, Howcroft was expressing only his personal grievances about the presence of tobacco smoke in the police station, or whether, as Howcroft insists, he exercised his First Amendment right to speak out on a subject of public interest.

Howcroft was hired by the city as a police officer in 1969. Beginning in about 1977, Howcroft had sinus problems. Regular treatment and a number of operations were required. Howcroft had been a heavy smoker, but his new sensitivity to smoke led him to quit smoking altogether.

By 1985, Howcroft commonly experienced headaches, sinus blockages, nose bleeds, watery and itching eyes, difficulty in breathing, and elevated blood pressure levels as well as serious

---

[3]Howcroft challenges the grant of summary judgment by the Superior Court to defendants McCorry and Champagne, arguing that McCorry filed no summary judgment motion and that Champagne's motion did not raise issues addressed by the judge. The Superior Court did not err in addressing the liability of all defendants in response to the various summary judgment motions before it. Howcroft had adequate notice and opportunity to present the court with all relevant materials on every issue decided by the court. See *Baldwin Crane & Equip. Corp.* v. *Riley & Rielly Ins. Agency, Inc.*, 44 Mass. App. Ct. 29, 32 (1997). "Even now, on appeal, the plaintiff suggests no unexplored factual issue that would have a bearing on the decision." *Id.* at 32-33. This is not a case where Howcroft was "surprised by the court's grant of summary judgment." *Langton* v. *Commissioner of Correction*, 34 Mass. App. Ct. 564, 576 (1993).

[4]We refer to the record appendix which appears to reflect an agreement among the parties. See Mass.R.App.P. 18(b), 378 Mass. 941 (1979). The appendix consists of over 400 pages. No motion to strike any document appearing in the appendix was made by any party, and we have drawn on the appendix to the extent necessary to present the facts consistently with the rules governing our review of a summary judgment decision.

[5]The phrase "the defendants" as used in the text always refers to the individual defendants unless the context requires that it refer to the city of Peabody as well.

respiratory tract discomfort caused by inhaling the tobacco smoke of others while at work in the police station. Concerned about his health, he brought the issue of tobacco smoke to his superiors on several occasions beginning in 1987, but to no avail.

On June 22, 1988, defendant Robert Champagne, the chief of the Peabody police department, issued a "General Order, Rules for Control Room," dated June 22, 1988, prohibiting smoking in the control room at the station, a large open space shared by the officers. At the same time Champagne designated the front lobby as the police station's smoking area. These orders were consistent with G. L. c. 270, § 22 (quoted above), but ignored the fact that G. L. c. 41, § 101A (quoted above), passed six months earlier and applicable to all officers appointed after January 1, 1988, prohibited smoking by such police officers both on the job and off the job.[6]

In 1989, Howcroft, then a patrol sergeant, worked primarily outside the station, although periodically he was required to work in the control room where, as noted above, smoking was prohibited. In early 1989, Howcroft, after becoming aware of the provisions of c. 270, § 22 — but apparently unaware of the provisions of c. 41, § 101A — told his immediate supervisor, Lieutenant John McCorry, of his sensitivity to smoking and requested that smoking be prohibited at roll call.[7] In response, McCorry began to smoke cigars at roll call and distributed cigars to at least one other officer during roll call. McCorry and other officers, including Champagne, also continued to smoke regularly in areas not designated for smoking.

In the fall of 1989, Howcroft confronted McCorry about his smoking in off-limits areas. In response, McCorry blew smoke in Howcroft's face and told him to "shut up."

On December 6, 1989, following Howcroft's complaints that there was a State law banning smoking in public buildings outside designated areas, McCorry ordered Howcroft to stand in a corner of the room during roll call, with at least three officers present. Shortly thereafter, McCorry reassigned Howcroft to the

---

[6]The applicability of § 22 only to officers appointed after January 1, 1988, was made clear in *Plymouth* v. *Civil Serv. Commn.*, 426 Mass. at 5, 7.

[7]The record is silent as to where in the building roll call took place.

position of operations sergeant, with duties *inside* the station.[8] Howcroft immediately asked McCorry to reconsider, noting the possible "serious health risk" of the reassignment. McCorry did not respond, and the following day Howcroft requested of the defendant Captain Milton Cottrell, McCorry's superior, that Howcroft be permitted to announce at roll call that the front lobby was the only designated smoking area, and also asked that McCorry's reassignment order be rescinded. Cottrell refused.

By letter dated December 7, 1989, Howcroft brought to Champagne's attention that the provisions of G. L. c. 270, § 22, were being disregarded and asked Champagne, as expressly permitted by § 22, to investigate the situation and inform Howcroft of his findings. See note 2, *supra.*

In response, Champagne told Howcroft that "[t]his is my building and as far as I am concerned, it is a smoking building and I know the law better than you do." Champagne did not respond in writing, as required by § 22.

The parties did agree that Howcroft would be allowed to close the connecting door between the lobby, where smoking was permitted, and the control room, where smoking was not permitted and where Howcroft worked. The following day, however, McCorry ordered that the connecting door be kept open. Howcroft's nose soon began to bleed and he left work early to seek medical attention. Despite repeated requests by Howcroft, neither Champagne nor Cottrell enforced the agreement to keep the door shut. On several occasions between December of 1989 and January of 1990, Howcroft wrote his superiors, providing them with notes from two doctors recommending that he not be exposed to smoke because of his sinus condition. Champagne called one of the physicians a "phony." Cottrell did not respond to these letters in writing and orally supported McCorry's orders.

Howcroft's health continued to deteriorate. On December 31,

[8]Howcroft grieved the matter through his union. The Labor Relations Commission found that the reassignment was not improper under the collective bargaining agreement and dismissed the prohibited practice charge. However, the assignment represented a change from prior practice and by reassigning Howcroft to operations, McCorry placed a junior sergeant over Howcroft as the officer in charge of the shift.

1989, when Howcroft informed McCorry that he was going home sick because of the blockage of his sinuses and a severe sinus headache, McCorry's response was to relieve Howcroft from duty indefinitely, telling him not to return without a note from a doctor stating he is fit for duty. On January 3, Howcroft requested permission from Cottrell to return to work, asserting he was fit for duty. Cottrell denied the request and warned Howcroft not to "bother the chief."

On January 24, 1990, Cottrell, acting on Champagne's order, told Howcroft to report to the station and asked him to write a report detailing his condition. The information requested in the report had been provided by Howcroft in the series of letters from the previous month. Howcroft, who attended the meeting with union representatives, requested that he be allowed to speak with an attorney before answering the questions. Cottrell dismissed him, claiming that Howcroft had failed to comply with his order.[9]

On January 29, 1990, after calling Howcroft an "abuser" of sick time, Champagne ordered Howcroft back to work. Howcroft immediately complied with that order. On January 30, 1990, McCorry assigned a smoker to the desk at which Howcroft was working. McCorry subsequently entered the control room smoking a cigar and when Howcroft objected, McCorry told him to "shut up." During that same shift, Howcroft requested in writing that the air quality of the station be tested by the Department of Labor and Industries, Division of Occupational Hygiene (DLI).[10]

Over the following days, McCorry ordered officers to smoke right at the door leading into the control room. On January 31, 1990, after McCorry had positioned two smokers close to the control room door, Howcroft's sinuses became blocked and he developed a severe headache. When Howcroft requested permission to go home, McCorry, acting at Champagne's direction,

[9]Howcroft sent a letter of response to Cottrell the following day.

[10]Although the defendants contend otherwise, this allegation appears in both the original complaint and in the amended complaint, which Howcroft verified through his affidavit filed in opposition to the defendant's motions for summary judgment. In May 1990, a DLI engineer concluded that the air qual-. ity conformed to all applicable regulations but recommended that the tobacco-contaminated air not be recirculated to nonsmoking areas.

ordered Howcroft to place himself *in the custody of the patrol sergeant* for transportation to a local hospital. The patrol sergeant was ordered to wait with Howcroft through the examination. A doctor examined Howcroft and diagnosed a sinus infection.

On February 8, 1990, three days after Howcroft gave the defendants a letter from a doctor stating he "cannot be subjected to smoke or be in a poorly ventilated room," Champagne suspended Howcroft for five days without pay for "abuse of sick leave." Howcroft appealed the suspension to the final appointing authority, the mayor of Peabody, who increased the suspension to ten days. Howcroft appealed the suspension to the Civil Service Commission (the commission).

On appeal to the commission, an administrative magistrate found that the grounds for the discipline were "purely [a] pretext." The magistrate explained that both McCorry and Cottrell "were out to get [Howcroft] and were trying to come up with any reason at all to discipline him." Finding no just cause for the discipline, the magistrate recommended that the ten-day suspension be reversed, and that Howcroft be restored to his position without loss of pay. The magistrate also found that Cottrell had "demonstrate[d] utter bad faith in his dealings with [Howcroft]," and that Howcroft did not violate the department's rule 25 requiring officers out on sick leave to obtain permission from Champagne prior to leaving their homes.[11] The commission adopted the magistrate's findings of fact but imposed a suspension of one day.

On February 21, 1990, Howcroft filed this action in the Superior Court.

Difficulties among the parties continued. On two occasions in March of 1990, McCorry ordered Howcroft to work in the designated smoking area. Complaining letters and responses between the parties followed, but without resolution of the problem.

---

[11]Rule 25 provides in pertinent part as follows: "All officers disabled from work for sickness or injury and being carried on the time books of the department pursuant to Rule 25, shall remain at the residence officially listed in the Department's personnel records unless they receive prior permission from the Chief or Division Commander to be elsewhere."

Particularly noteworthy was a letter from Chief Champagne to Howcroft dated April 3, 1990, rejecting entirely Howcroft's concerns and making it clear that minor infractions of § 22 were tolerable in order to give "an officer [who] wishes to smoke a cigarette" the opportunity for a "short break." This letter was over two years after the enactment of § 22 and fifteen months after the Legislature imposed the ban on smoking by certain police officers. The defendants' brief offers no explanation.

In late 1990, Howcroft injured his hand while on duty. Although Champagne granted some of Howcroft's requests pursuant to rule 25 to leave his home, he refused to allow Howcroft to attend family and holiday events. In October of 1991, Howcroft received a three-day suspension without pay from Champagne on the grounds of violation of sick leave rules. The suspension was rescinded by an arbitrator in the spring of 1992.

In early 1992, Howcroft suffered another hand injury while on duty. While on leave, Howcroft was again not permitted to leave his home pursuant to rule 25.

By 1993, Howcroft's physical and mental health had substantially declined and on November 23, 1993, Howcroft worked his last shift. Around this time, for the first time in his life, Howcroft was diagnosed with depression. The city denied his application for disability benefits under G. L. c. 41, § 111F.[12] Howcroft, through his union, appealed the denial to an arbitrator, arguing that his disability was causally related to conditions of his employment, including his treatment while on leave for his hand injuries, respiratory ailments, and stress caused by his working conditions subsequent to his complaints concerning smoking in the workplace. Throughout the proceedings, the city argued that Howcroft's ailments were not causally related to his employment.

---

[12]Section 111F provides, in part, that a police officer who is incapacitated for duty because of an injury sustained in the performance of his duty without fault of his own "shall be granted leave without loss of pay for the period of such incapacity." G. L. c. 41, § 111F, inserted by St. 1952, c. 419.

There was an abundance of expert testimony before the arbitrator on the basis of which the arbitrator concluded, in an award dated February 20, 1998, that the city violated the collective bargaining agreement by denying Howcroft § 111F benefits. Howcroft was awarded § 111F benefits from November 23, 1993 to August 11, 1996, the date he had been granted an accidental disability retirement by the city's retirement board. In his award, the arbitrator concluded that "the employment circumstances experienced by [Howcroft] following his request that smoking be curtailed in the police station led to his anxiety, depression, post-traumatic stress disorder, insomnia disorder, as well as physiological symptoms related thereto that caused his disability." The arbitrator further concluded that Howcroft's disability was "causally related to the employment experiences [he] encountered following his support of the non-smoking ban in 1989."

We have stated that the mayor's decision regarding Howcroft's suspension without pay was in response to the recommendation of Champagne, and we infer that the city's decision regarding Howcroft's disability benefits was also in response to the recommendation of Champagne. Both the mayor's decision and the city's decision were reversed by the arbitrator's decision, as stated above.

To this historical record we add the affidavit filed by Howcroft in opposition to the defendants' motions. The affidavit consists of two pages, the major features of which are (i) the affirmation of the allegations of the complaint, and (ii) statements to the effect that (A) by standing up for his own rights, others "who may be less assertive or otherwise less able to speak up" are benefited; (B) he understood that other Peabody police officers are irritated by tobacco smoke; (C) upon becoming aware of the law regarding smoking in public buildings, he sought "enforcement in the police station of the law against permitting smoking outside of designated areas," and that his "efforts to secure compliance with the law were through what I thought were correct channels — through my immediate supervisor, Defendant McCorry, and through my union"; and (D) because of Mc-

Corry's failure to respond, he petitioned Chief Champagne "for enforcement of the state law."[13]

We turn to the legal issues presented, keeping in mind that we view all the summary judgment materials, and inferences therefrom, favorably to Howcroft, and that the defendants, as the moving parties, have assumed "the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue, even if [they] would have no burden on an issue if the case were to go to trial," and demonstrating further that they are entitled to judgment as a matter of law. *Pederson v. Time, Inc.*, 404 Mass. 14, 17 (1989).

*Federal Civil Rights Claim — 42 U.S.C. § 1983*[14] *(Count I).*[15]

The fundamentals for this discussion are beyond dispute. "[I]t has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). See *Caron v. Silvia*, 32 Mass. App. Ct. 271, 276 (1992). The foundational principle is that the "State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.' " *Connick v. Myers*, 461 U.S. at 140, quoting from

---

[13]Presumably this refers to Howcroft's letter of December 7, 1989, directing Champagne's attention to the provisions of G. L. c. 270, § 22, as described in the text, *supra*.

[14]Section 1983 provides in part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."

[15]On this count we summarily affirm summary judgment for the city and the individual defendants in their official capacities. The individual defendants in their official capacities are not "persons" under § 1983. See *Laubinger v. Department of Rev.*, 41 Mass. App. Ct. 598, 602 (1996) ("the law treats the action as [one] against the official's office and hence against the State"), quoting from *O'Malley v. Sheriff of Worcester County*, 415 Mass. 132, 141 n.13 (1993). A municipality may be liable under § 1983, see *Monell v. Department of Social Servs. of New York*, 436 U.S. 658, 688, 694 (1978), but only if the injury is caused by "officials whose acts may fairly be said to be those of the municipality," or if there is a municipal policy or custom that caused the injury. *County Commrs. of Bryan County v. Brown*, 520 U.S. 397, 403-404 (1997). Neither condition is satisfied here.

*Pickering* v. *Board of Educ.*, 391 U.S. at 568. Further, "[t]he First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with smaller ones, are guarded.' " *Connick* v. *Myers*, 461 U.S. at 147, quoting from *Mine Workers* v. *Illinois Bar Assn.*, 389 U.S. 217, 223 (1967). The problem is to arrive "at a balance between the interests of the [employee], as a citizen, *in commenting upon matters of public concern* and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" (emphasis supplied). *Pickering* v. *Board of Educ.*, 391 U.S. at 568.

We determine first, on the basis of our review of the "content, form, and context of a given statement, as revealed by the whole record," *Connick* v. *Myers*, 461 U.S. at 147-148, whether Howcroft was speaking on a matter of public concern, or *only* regarding a matter of personal interest. See *id.* at 149 ("the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs"). If Howcroft's speech raises issues of public concern, his First Amendment right must be balanced against the governmental interest in promoting the efficient performance of public service of its employees. See *Pickering* v. *Board of Educ.*, 391 U.S. at 568.[16] See also *Pereira* v. *Commissioner of Social Servs.*, 432 Mass. 251, 257 (2000); *O'Connor* v. *Steeves*, 994 F.2d 905, 913 (1st Cir.), cert. denied sub nom. *Nahant* v. *O'Connor*, 510 U.S. 1024 (1993).

Since these inquiries directly raise First Amendment issues, "an appellate court has an obligation to 'make an independent

---

[16]Howcroft must also show that his speech was a substantial or motivating factor in the adverse employment action. See *Pereira* v. *Commissioner of Social Servs.*, 432 Mass. 251, 257 n.15 (2000). See also *O'Connor* v. *Steeves*, 994 F.2d 905, 913 (1st Cir.), cert. denied sub nom. *Nahant* v. *O'Connor*, 510 U.S. 1024 (1993). The defendants do not dispute that Howcroft was subjected to an adverse employment action. See, e.g., *Piver* v. *Pender County Bd. of Educ.*, 835 F.2d 1076, 1078 (4th Cir. 1987) (retaliatory conduct need not consist of termination of employment), cert. denied, 487 U.S. 1206 (1988); *Dahm* v. *Flynn*, 60 F.3d 253, 257 (7th Cir. 1994) (holding that a qualitative reduction in job responsibilities may constitute adverse employment action). They argue that Howcroft's speech was not addressed to matters of public concern, and that employment decisions regarding Howcroft were a reasonable and necessary response to Howcroft's conduct. As to the defendants' motivation, see note 22, *infra.*

examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free speech.' " *Pereira* v. *Commissioner of Social Servs.*, 432 Mass. at 258, quoting from *O'Connor* v. *Steeves*, 994 F.2d at 912-913.

*Matter Of Public Concern.*

As for the case before us, Howcroft argues that his complaints about the non-enforcement of § 22 by the defendants was speech that addressed a matter of public concern, and permits this action for damages and other relief under 42 U.S.C. § 1983[17] for violations of his First Amendment rights.[18] See *Piver* v. *Pender County Bd. of Educ.*, 835 F.2d 1076, 1078 (4th Cir. 1987), cert. denied, 487 U.S. 1206 (1988). "The inquiry into the protected status of speech is one of law, not fact." *Connick* v. *Myers*, 461 U.S. at 148 n.7.

There was at all times material hereto — and there still is — an intense public interest in the public health implications of so-called secondhand tobacco smoke. It was made particularly evident when, in 1987, the Legislature created G. L. c. 270, § 22, and, with regard to police officers, prospectively banned smoking by the police or firefighters in any city or town, G. L. c. 41, § 101A, by the state police, see St. 1987, c. 697, § 5, now codified at G. L. c. 22C, § 10, 2d par., and by the Massachusetts Bay Transportation Authority police, see St. 1987, c. 697, § 11, codified at G.L. c. 31, § 64, because of the correlation between smoking and poor health, with the resulting drain on public funds.[19] It is beyond dispute that secondhand

---

[17]"A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law . . . second, the conduct must have worked a denial of rights secured by the Constitution or by [F]ederal law." *Coughlin* v. *Department of Correction*, 43 Mass. App. Ct. 809, 812 (1997), quoting from *Soto* v. *Flores*, 103 F.3d 1056, 1061 (1st Cir.), cert. denied, 522 U.S. 819 (1997). The defendants do not dispute that as police officers of a public employer acting in the regular course of their duties, they acted under color of State law.

[18]Howcroft has not based any of his civil rights claims upon any right secured by the Massachusetts Constitution. See *Atterberry* v. *Police Commr. of Boston*, 392 Mass. 550, 555 (1984) (where the plaintiff raises "no separate discussion of Massachusetts constitutional principles . . . we review the plaintiff's claim solely on the basis of an alleged violation of Federal constitutional principles").

[19]In *Plymouth* v. *Civil Serv. Commn.*, 426 Mass. 1 (1997), the court reversed

tobacco smoke, and its effect on the health of the public, is a matter of deep and abiding public interest. See *Caron* v. *Silvia,* 32 Mass. App. Ct. at 275 ("There certainly has been considerable public debate about the dangers of smoking both to smokers and others in their immediate vicinity and the extent to which smoking should be tolerated in public places").

The defendants argue that what Howcroft said and wrote to the defendants expressed his concern for his own health and nothing else. The argument overlooks entirely that the decisive portion of what Howcroft said and wrote included expressions of his concern regarding the continuing failure of those in charge of the Peabody police department — the individual defendants — to see to the enforcement of § 22 in the station house. On December 7, 1989, Howcroft wrote Champagne bringing to his attention that the Peabody police station was not in compliance with the provisions of § 22, and requesting Chief Champagne, as expressly authorized by that section, see note 2, *supra,* to investigate the matter "and inform [Howcroft] of his findings." The answer he received — "This is my building and as far as I am concerned, it is a smoking building and I know the law bet-

_____

a decision of the Civil Service Commission reinstating a police officer who had been terminated for violating the smoking prohibition of G. L. c. 41, § 101A. The court discussed the purpose of the smoking ban for police and firefighters:

> "There is material in the record suggesting that *the purpose of § 101A is to prevent police officers and fire fighters from increasing their risk of hypertension and heart disease by smoking and, therefore, their eligibility for disability retirement benefits under G.L. c. 32, § 94.* [Section 101A applies] . . . only to police officers and fire fighters who, because of the nature of their jobs, are already at high risk for developing hypertension and heart disease. The Legislature appears to have made a policy decision, based on financial interests, that employment in these positions should no longer be open, after January 1, 1988, to persons who smoke tobacco products so that, over a period of time, police and fire departments will have a workforce free of a serious disease-causing addiction." (Emphasis supplied.)

*Plymouth* v. *Civil Serv. Commn.,* 426 Mass. at 7. See also note 4 to the court's opinion, *id.* at 5 n.4, observing that § 101A was enacted apparently "in an effort to reduce the number of police officers and fire fighters who obtain substantial disability benefits from public funds under G. L. c. 32, § 94 . . . as a result of heart disease due to smoking," and citing cases from other jurisdictions involving similar smoking bans.

ter than you do" — had no justification. Further, Howcroft's affidavit states that by his actions — his speaking out — he sought "enforcement in the police station of the law against permitting smoking outside of designated areas." Of course, Howcroft is not "disqualified from First Amendment protection merely because [he] had a personal stake in the controversy." *Caron* v. *Silva*, 32 Mass. App. Ct. at 275. See *Campbell* v. *Towse*, 99 F.3d 820, 827 (7th Cir. 1996).

So too McCorry, while in the control room where smoking was prohibited, blew tobacco smoke in the face of Howcroft and told him to "shut up." These events illustrate the deliberate failure of the defendants to conform to and enforce the provisions of § 22.

To these facts we add the witting or unwitting failure of those in charge of the Peabody police force — the defendants — to inform the police force of the introduction of the complete ban on smoking as to officers appointed after January 1, 1988. The substantial public interest in a healthy police force appears to have been ignored entirely. See *Plymouth* v. *Civil Serv. Commn.*, described in note 19, *supra*.

It is in this context of comprehensive legislation designed to address the public's concern about the public health danger from tobacco smoke, and the alleged failure and refusal of the defendants to enforce the provisions of § 22, that Howcroft's words and conduct become speech that is protected by the First Amendment. Howcroft's expressions of his personal grievances do not nullify the deliberate failure of the defendants — law enforcement authorities — to enforce the provisions of § 22, and the alleged flaunting of that failure in their arbitrary and abusive conduct toward Howcroft.

*Myers* v. *Hasara*, 226 F.3d 821 (7th Cir. 2000), is instructive. There the plaintiff, a city health inspector, was disciplined for having told the manager of a mall that one of his tenants was in violation of its required permit and that the city had decided to take no action against the tenant. When the plaintiff brought suit, the city defended on the grounds that she was concerned with the dispute with her supervisors over the permit, not with a

matter of public concern. *Id.* at 827. The court dismissed the argument. "It is important to good government that public employees be free to expose misdeeds and illegality in their departments." *Id.* at 826. "*Whistleblowing does not need to be limited to systemic charges of corruption to qualify as a matter of public concern. A specific violation of a law that creates a risk to public health, safety or good governance likewise is a matter of public concern*" (emphasis supplied). *Id.* at 827.

A matter of public concern does not "*lose* its importance merely because it arises in an employee dispute" (emphasis original). *Hall* v. *Ford*, 856 F.2d 255, 260 (D.C. Cir. 1988). See *Rode* v. *Dellarciprete*, 845 F.2d 1195, 1202 (3d Cir. 1988) ("Dismissing [the plaintiff's] speech as unprotected merely because she had a personal stake in the controversy fetters public debate on an important issue because it muzzles an affected public employee from speaking out").

Speech about official malfeasance or abuse of office by senior officers of the Peabody police force, in failing to enforce § 22 and thereby exhibiting an unexcused disinterestedness in a matter of intense public interest, is speech which is of inherent public interest and obviates any need to consider Howcroft's motives or his personal concerns. See *O'Connor* v. *Steeves*, 994 F.2d at 913-915. See also *Conaway* v. *Smith*, 853 F.2d 789, 796 (10th Cir. 1988) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import").

On the basis of the record before us, viewing all that Howcroft said and did favorably to him, we conclude — but only in the context of reviewing the allowance of summary judgments in favor of the defendants — that Howcroft's speech involved matters of public concern.[20]

---

[20]The defendants, as did the motion judge, rely principally on *Smith* v. *Fruin*, 28 F.3d 646 (7th Cir. 1994), cert. denied, 513 U.S. 1083 (1995). In *Fruin*, the court, while acknowledging that "the issue of second-hand smoke was a matter of widespread public interest in July of 1991," *id.* at 651, ruled in favor of the defendants on their motion for summary judgment, having concluded that Smith's "complaints were entirely personal in nature." *Ibid.* That conclusion was amply supported by Smith's admission in his deposition

*The* Pickering *Balance Test.*

We turn to *Pickering* v. *Board of Educ.*, 391 U.S. at 568-575. "Under *Pickering*, we are required to balance the significance of the interests served by the public-employee speech — including the employee's interests in communicating, and the interests of the community in receiving, information 'on matters of public importance' — against the governmental employer's legitimate interests in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *O'Connor* v. *Steeves*, 994 F.2d at 915. See *Connick* v. *Myers*, 461 U.S. at 150-154; *MacDonough* v. *Directors of Mass. Hous. Fin. Agency*, 28 Mass. App. Ct. 538, 544 (1990).

The police have an obvious need to "promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence." *Shands* v. *Kennett*, 993 F.2d 1337, 1344 (8th Cir. 1993), cert. denied, 510 U.S. 1072 (1994), quoting from *Hughes* v. *Whitmer*, 714 F.2d 1407, 1419 (8th Cir. 1983), cert. denied sub nom. *Hughes* v. *Hoffman*, 465 U.S. 1023 (1984). See *Moore* v. *Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995) (need for discipline, loyalty, and harmony among co-workers is heightened in police departments). Moreover, Howcroft's complaints, and the alleged retaliation by the defendants, may well have had an adverse impact on the working relationships at the Peabody police station.

Nonetheless, the defendants have failed to demonstrate a legitimate interest in suppressing Howcroft's speech. As evidence of the disruption of operations, the defendants note that Howcroft left work early on several occasions during December 1989 and January 1990 and remained out on sick or administrative leave. However, based on a reading of the facts most favorable to Howcroft, it was the defendants' arbitrary retaliations, and not Howcroft's exercise of his First Amendment rights, that caused the disruption in the operation of the department. See *Rankin* v. *McPherson*, 483 U.S. 378, 384 (1986) ("Vigilance is necessary to ensure that public employers do not

that at all times he was speaking only for himself and only about his own problems, thereby rejecting any concern or interest in the public health issue. *Id.* at 647-648. *Fruin* is inapposite to the facts in this case.

use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.").

Howcroft's speech concerning the abuse of power by public officials is given strong First Amendment protection. See *O'Connor* v. *Steeves, supra* at 916 ("The strong *public* interest in [the disclosure of unauthorized purchasing practices by a town official] supplements O'Connor's relatively slight *personal* interest in speaking out, heavily weighting the *Pickering* scale in favor of First Amendment protection against retaliation for O'Connor's speech" [emphasis original]); *Azzaro* v. *County of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) (employee's reports of sexual harassment by executive assistant to county commissioner were of public concern and thus protected even if personal in motivation), *Caron* v. *Silvia*, 32 Mass. App. Ct. at 277-278. Contrast *Smith* v. *Commissioner of Mental Retardation*, 409 Mass. 545, 551-552 (1991) (finding plaintiff's statements "unprotected statements of an employee upon matters of only personal interest").

Further, there is nothing in the record before us suggesting that the time, manner, and place of Howcroft's complaints were disruptive to the workplace. See *Givhan* v. *Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415 n.4 (1979) ("[T]he employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered"). Howcroft, appropriately, first spoke with his superiors in private and properly sought assistance from public agencies and his union.[21] Moreover, Howcroft's expression directed to Champagne was more than a complaint from a subordinate to a superior; it was guided by G. L. c. 270, § 22. See note 2, *supra*. On this record, seen in a light most favorable to Howcroft, we cannot say that the defendants' interest in suppressing Howcroft's speech

---

[21]That Howcroft brought his concerns to the attention of his superior rather than the public at large does not preclude protection under the First Amendment. See *Givhan* v. *Western Line Consol. Sch. Dist.*, 439 U.S. at 415-416.

outweighed the public interest in Howcroft's complaints and disclosures.[22]

To sum up the § 1983 summary judgment record favorable to Howcroft: The passage of § 22, a public health statute designed to protect all those for whom tobacco is or may be injurious, was flouted by police officers who were aware of the statute and whose duty it was to enforce its provisions — and certainly to enforce it within their own quarters. Howcroft's speech concerned the defendants' malfeasance in office and abuse of power. The defendants deliberately ignored § 22, choosing instead to retaliate by intimidation and penalties as part of a deliberate effort, without justification, to suppress Howcroft's speech and conduct, and in so doing failed in the performance of their duties as law enforcement officers.

Because there remains a genuine issue of material fact whether the defendants responded to Howcroft's expression of his concerns on a matter of public concern by retaliatory employment decisions, and because the defendants were not entitled to summary judgment as a matter of law, summary judgment for the defendants on Howcroft's § 1983 claim was error.

We emphasize that our conclusion, that Howcroft's speech touched on a subject of public interest and concern, is derived in part from the procedural necessity, arising out of the consideration of motions for summary judgment, of viewing the facts favorably to Howcroft, and drawing all reasonable inferences that are advantageous to him. Whether the same conclusion will be available at the trial on the merits must await that event.

*State Civil Rights Claim — MCRA (Count II).*

We affirm summary judgment in favor of the city on Howcroft's State civil rights claim because we conclude that a municipality is not a "person" covered by the Massachusetts

---

[22]On the record before us, we also may infer, consistently with the decisions of the magistrate and the two arbitrators, that Howcroft's speech provided the motivating factor in the adverse employment decisions. See *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Harris* v. *Trustees of State Colleges,* 405 Mass. 515, 523 (1989). However, the issue is not in dispute in this appeal.

Civil Rights Act (MCRA), G. L. c. 12, §§ 11H, 11I. In *Batch-elder* v. *Allied Stores Corp.*, 393 Mass. 819, 821 (1985), the court compared the provisions of § 1983 with those of the MCRA; the MCRA, unlike § 1983, is available *"whether or not* [the person or persons are] acting under color of law" (emphasis supplied). G. L. c. 12, § 11H, inserted by St. 1979, c. 801, § 1. Those observations regarding the absence of the need to show State action under the MCRA, however, did not dispose of the question whether a municipality is a "person" under the MCRA. That issue was expressly left open in *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 391 (1996).

As stated in note 15, *supra*, a municipality may be liable as a "person" under § 1983, see *Monell* v. *Department of Social Servs. of New York*, 436 U.S. 658, 688, 694 (1978), but that result was reached only by tracing the Federal legislative history immediately preceding the passage by Congress of the Civil Rights Act of 1871, a precursor to § 1983. See, in particular, *id.* at 688, citing Act of Feb. 25, 1871, § 2, 16 Stat. 431 (defining person to include "bodies politic and corporate"). That legislative history has no bearing on the MCRA. What is important is that G. L. c. 4, § 7, Twenty-third, only defines person to include "corporations, societies, associations and partnerships." By the terms of G. L. c. 4, § 7, its definitions govern the construction of statutes unless a contrary intention clearly appears, and here there is no indication in the MCRA that the word "person" includes either the Commonwealth or any of its political subdivisions. See *Commonwealth* v. *ELM Med. Labs., Inc.*, 33 Mass. App. Ct. 71, 74-80 (1992).[23] See also *Hansen* v. *Commonwealth*, 344 Mass. 214, 219 (1962) ("it is a widely accepted rule of statutory construction that general words in a statute such as 'persons' will not ordinarily be construed to include the State or political subdivisions thereof"); *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 473 n.8 ("[t]he Massachusetts Civil Rights Act was enacted in response to deprivations of secured rights by private individuals

[23]Although we specifically reserved the question of municipal immunity to MCRA suits in *Commonwealth* v. *ELM Med. Labs., Inc.*, 33 Mass. App. Ct. at 76 n.8, wherein we decided that neither the Commonwealth nor a department thereof is a "person" under the MCRA, much of the reasoning of that opinion carries force here. See *id.* at 74-80.

using violence or threats of violence"), cert. denied, 513 U.S.
868 (1994); *Sarvis* v. *Boston Safe Deposit & Trust Co.*, 47
Mass. App. Ct. 86, 96 (1999) ("There is nothing in the MCRA
to indicate clearly that the Legislature did not intend the term
'person' to take on the statutory definition appearing in G. L.
c. 4, § 7, Twenty-third"); Randall & Franklin, Municipal Law
& Practice § 6 (4th ed. 1993) ("General words such as
'persons' will not customarily be construed to include the Com-
monwealth or any of its political subdivisions . . . . When the
Legislature intends that provisions in a statute apply to
municipalities or governmental entities, it will generally
manifest that intent expressly in language to that effect").
Contrast *Broderick* v. *Roache*, 803 F. Supp. 480, 484-485 (D.
Mass. 1992), with which we are not in agreement insofar as it
supports municipal liability under the MCRA.

We also affirm summary judgment on this count in favor of
the individual defendants in their official capacities. See
*O'Malley* v. *Sheriff of Worcester County*, 415 Mass. 132, 141
n.13 (1993) ("[T]o avoid a State's sovereign immunity to a
damages suit, a plaintiff must sue the State official in his
individual and not his official capacity").

We turn now to the liability of the remaining defendants,
each in his individual capacity. The MCRA creates no substan-
tive civil rights; rather, it provides a mechanism for obtaining
relief from the interference, or attempted interference, with
rights conferred by Federal or Massachusetts law. See G. L.
c. 12, §§ 11H, 11I.[24] To prove a claim under the MCRA,
Howcroft must show an interference, or attempted interference,

[24]General Laws c. 12, § 11H, inserted by St. 1979, c. 801, § 1, provides in
pertinent part as follows: "Whenever any person or persons, whether or not
acting under color of law, interfere by threats, intimidation or coercion, or at-
tempt to interfere by threats, intimidation or coercion, with the exercise or
enjoyment by any other person or persons of rights secured by the constitution
or laws of the United States, or of rights secured by the constitution or laws
of the commonwealth, the attorney general may bring a civil action for injunc-
tive or other appropriate equitable relief in order to protect the peaceable
exercise or enjoyment of the right or rights secured."

General Laws c. 12, § 11I, inserted by St. 1979, c. 801, § 1, provides in
part as follows: "Any person whose exercise or enjoyment of rights secured
by the constitution or laws of the United States, or of rights secured by the
constitution or laws of the commonwealth, has been interfered with, or at-

with the exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of Massachusetts, by means of "threats, intimidation, or coercion." *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. at 395.

Howcroft has established a sufficient evidentiary basis to present a genuine issue whether the defendants engaged in a pattern of harassment and intimidation in an attempt to suppress the free speech rights of Howcroft regarding tobacco smoke inside the station house, as discussed above. The allegations supported by the summary judgment record, including the defendants' deliberate disregard of State law regarding prohibited smoking in designated areas of the station house, harassment of Howcroft by ordering him to "shut up," blowing smoke in his face after he complained, reassignment of Howcroft to the station house (an act designed, we infer, to increase Howcroft's exposure to tobacco smoke), the declaration by Champagne that the station house was "my building" and a "smoking building," the failed attempts to suspend Howcroft without pay or to deprive him of benefits to which he was subsequently found entitled, and the arbitrary enforcement of rule 25, permit the conclusion that Howcroft has presented a triable issue whether the defendants attempted to silence him by concerted harassment and retaliation amounting to prohibited intimidation. See *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. at 474 (" 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct"). See also *Broderick* v. *Roache*, 803 F. Supp. 480, 485-487 (D. Mass. 1992) (scheme of harassment and retaliation that included disciplining police officer without cause would satisfy requirement of threats, intimidation, or coercion), *S.C.*, 996 F.2d 1294 (1st Cir. 1993); *Reproductive Rights Network* v. *President of the Univ. of Mass.*, 45 Mass. App. Ct. 495, 505-509 (1998) (reviewing case law).

On the record before us, viewed favorably to Howcroft, the defendants have not shown that they would be entitled to judg-

tempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages."

ment on this count as a matter of law, and the defendants' motions for summary judgment on this count should have been denied.

*Qualified Immunity.*

The defendants argue that each one is entitled to the defense of qualified immunity from both the § 1983 and MCRA claims.

The qualified immunity principles developed under § 1983 apply equally to claims under the MCRA. *Duarte* v. *Healy*, 405 Mass. 43, 46-48 (1989).

"The doctrine of qualified immunity shields public officials who are performing discretionary functions, not ministerial in nature, from civil liability in § 1983 [and MCRA] actions if at the time of the performance of the discretionary act, the constitutional or statutory right allegedly infringed was not 'clearly established.' " *Laubinger* v. *Department of Rev.*, 41 Mass. App. Ct. 598, 603 (1996), citing *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982). See *Breault* v. *Chairman of the Bd. of Fire Commrs. of Springfield*, 401 Mass. 26, 31-32 (1987), cert. denied sub nom. *Forastiere* v. *Breault*, 485 U.S. 906 (1988); *Duarte* v. *Healy*, *supra* at 47-48. The question is whether Howcroft's right to speak out regarding tobacco smoke in the station house was "clearly established" when the defendants allegedly undertook their retaliatory actions.

We have concluded, *supra*, that the summary judgment record demonstrates that there are genuine issues for trial regarding Howcroft's § 1983 and MCRA claims. Those claims rest on (i) the 1968 decision of the Supreme Court in *Pickering* v. *Board of Educ.*, 391 U.S. at 568, establishing the right of public employees to speak out on matters of public concern without having to suffer retaliatory employment decisions, see *Connick* v. *Myers*, 461 U.S. at 142; *Caron* v. *Silvia*, 32 Mass. App. Ct. at 276, and (ii) the enactment of G. L. c. 270, § 22, on January 14, 1988. The alleged offending conduct of the defendants began *after* Champagne, on June 22, 1988, issued his order of compliance with § 22.

There is no basis at this stage of the proceedings to conclude that the defendants are entitled to qualified immunity sufficient

to defeat Howcroft's civil rights claim under Federal and State law.

*Intentional infliction of emotional distress (Count III).*

In order to prevail on a claim of intentional infliction of emotional distress, Howcroft must show "(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress. To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community. Liability cannot be founded upon mere insults, threats, or annoyances." *Cady* v. *Marcella,* 49 Mass. App. Ct. 334, 340-341 (2000), quoting from *Sena* v. *Commonwealth,* 417 Mass. 250, 263-264 (1994).

Howcroft's intentional tort claims against the city fail because under the Massachusetts Tort Claims Act, G. L. c. 258, § 10(*c*), municipalities are not liable for "any claim arising out of an intentional tort, including . . . interference with advantageous relations or interference with contractual relations." *Swanset Dev. Corp.* v. *Taunton,* 423 Mass. at 397. Accordingly, Howcroft's like claims for damages against the other defendants in their official capacities were properly dismissed. See *O'Malley* v. *Sheriff of Worcester County,* 415 Mass. at 141 n.13.

However, Howcroft's claims for intentional infliction of emotional distress against the remaining defendants in their individual capacities are not barred by governmental immunity. See *Spring* v. *Geriatric Authy. of Holyoke,* 394 Mass. 274, 286 n.9 (1985); *Laubinger* v. *Department of Rev.,* 41 Mass. App. Ct. at 601-602. Because the summary judgment record reasonably supports the elements of these claims, they are entitled to go to a jury.

Summary judgment dismissing this count must be reversed as to the individual defendants.

*Interference with contract and/or advantageous relations
(Count IV).*[25]

As to the individual defendants,[26] to establish a claim of intentional interference with contractual or business relations, Howcroft must show "(1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendants' knowledge of the contract or business relationship; (3) the defendants' intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages." *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. at 397.

The defendants argue that there was no evidence of improper means or motive. We disagree. A jury reasonably could find either that the defendants used improper means or that they acted out of an improper motive — i.e., for a "spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Shea* v. *Emmanuel College*, 425 Mass. 761, 764 (1997). See *Draghetti* v. *Chmielewski*, 416 Mass. 808, 816-817 & n.11 (1994). Summary judgment for the individual defendants on this count was improper.

*Conclusion.*

The judgments dismissing Howcroft's claims against the city and the individual defendants in their official capacities are affirmed. The judgments dismissing Howcroft's civil rights claims (Counts I and II), intentional infliction of emotional distress claims (Count III), and claims of intentional interference with advantageous relationships (Count IV), are reversed with respect to the individual defendants in their individual capacities.

The case is remanded to the Superior Court for further proceedings.

*So ordered.*

---

[25]The motion judge granted summary judgment to the individual defendants on the ground that the claim was preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. On appeal, the defendants have correctly abandoned this argument. See *Police Dept. of Chicago* v. *Mosley*, 408 U.S. 92, 102 n.9 (1972) (city is not employer within the meaning of the National Labor Relations Act), citing 29 U.S.C. § 152. See also 29 U.S.C. § 142 (applying same definition to Labor Management Relations Act).

[26]Howcroft did not sue the city, or the other defendants in their official capacities, under this cause of action.