Mohammad Farooq **AFREEDI**
and Daniel Lourdusamy
Joyce, Plaintiffs,

v.

Steven C. **BENNETT** and Steven
Devlin, Defendants.

**C.A. No. 05–12461–MLW.**

United States District Court,
D. Massachusetts.

Aug. 20, 2007.

Mara M. Dolan, Law Offices of Mara Dolan, Andover, MA, for Plaintiffs.

Joseph P. Kittredge, Suzanne T. Caravaggio, Rafanelli & Kittredge, P.C., Acton, MA, Charles M. Wyzanski, Attorney General's Office, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

The court has received the attached Magistrate Judge's Report and Recommendation concerning defendant Steven Devlin's motion for summary judgment. There were no objections to the Report and Recommendation filed within the period provided by Federal Rule of Civil Procedure 72(b).

The court finds the Magistrate Judge's Report and Recommendation to be thorough, thoughtful, and persuasive.

Accordingly it is hereby ORDERED that:

1. The attached Report and Recommendation (Docket No. 43) is ADOPTED

and INCORPORATED pursuant to 28 U.S.C. § 636(b)(1)(C).

2. For the reasons stated in the Report and Recommendation, Devlin's Motion for Summary Judgment (Docket No. 10) is ALLOWED.

3. The plaintiffs' claims against defendant Steven C. Bennett shall remain before the Magistrate Judge for pretrial purposes.

*ORDER ON DEFENDANT BENNETT'S MOTION TO DISMISS AND/OR FOR SANCTIONS*

SOROKIN, United States Magistrate Judge.

In response to an Order of Reference dated May 3, 2006 (Docket # 8), Defendant Bennett's Motion to Dismiss and/or for Sanctions (Docket # 23) is ALLOWED IN PART and DENIED IN PART.

*INTRODUCTION AND PROCEDURAL HISTORY*

On September 22, 2005, the Plaintiffs brought suit in the Superior Court of the Commonwealth of Massachusetts. They alleged, *inter alia*, civil rights violations pursuant to both state and federal law, with each claim asserted in their Complaint arising from the Defendants' arrests of the Plaintiffs, which they alleged to be without probable cause. Docket # 2. On December 8, 2005, Defendant Bennett removed the case to this Court pursuant to 28 U.S.C. § 1441 and § 1446. Docket # 1.

On May 25, 2006, the Plaintiffs served Rule 26(a) disclosures which identified witnesses, but which were not in compliance with Rule 26(a)(1)(b)'s requirement that they provide to the other parties without awaiting a discovery request "a copy of, or a description by category or location, of all documents ... that the disclosing party may use to support [their] claims." The Plaintiffs have not, to date, made those

disclosures, although by the terms of an agreement endorsed by the Court they were to be made by August 10, 2006. *See Order of August 10, 2006; Affidavit of Suzanne T. Caravaggio,* Docket 23–2, at ¶ 7.

On September 28, 2006, Bennett served upon each Plaintiff both his requests for production of documents pursuant to Fed. R.Civ.P. 34 and his first set of interrogatories pursuant to Fed.R.Civ.P. 33. Docket # 23–2, at ¶ 8. On December 12, 2006, Bennett's counsel had received no response and inquired of Plaintiffs' counsel as to the status of the answers. *Id.,* at ¶ 9. Plaintiffs' counsel reported that she would serve responses prior to a status conference scheduled for January 8, 2007. *Id.* She did not do so. *Id.,* at ¶ 10. On February 16, 2007, Bennett's counsel wrote to Plaintiff's counsel informing her that a motion to compel was imminent. Docket # 23–3. On February 26, 2007, Bennett filed the motion to compel. Docket # 18. On February 27, 2007, the Court set a hearing on the motion to compel for March 9, 2007 (the same date on which co-Defendant Devlin's motion for summary judgment was scheduled to be heard), and ordered the Plaintiffs to file their opposition by the close of business on March 7, 2007. Subsequently, because of Plaintiffs' counsel's illness, the motion hearing was continued and the Plaintiffs were given an extension until March 19, 2007, to oppose the motion to compel. Docket # 19. The Plaintiffs neither opposed Bennett's motion to compel by that deadline, nor sought an extension. Accordingly, the Court allowed the motion as unopposed on March 22, 2007. Docket # 21. The Court also ordered the documents sought therein to be produced by April 2, 2007. *Id.* Despite the Order, they were not produced by that date. Bennett then filed the pending motion for dismissal and/or sanctions on April 11, 2007. Docket # 23.

At the summary judgment hearing held on April 13, 2007, the Court ordered Plaintiffs' counsel to produce the discovery by April 30, 2007. The Court also set a deadline of April 30, 2007, for the Plaintiffs to respond to the motion for sanctions and/or dismissal and set the hearing of that motion for May 9, 2007. On April 25, 2007, the Plaintiffs filed an opposition to the motion to dismiss and/or for sanctions which consisted solely of a statement that the Plaintiffs opposed the motion (and thus was not in compliance with L.R. 7.1(B)(2)'s requirement that an opposition include "a memorandum of reasons, including citation of supporting authorities, why the motion should not be granted"). Docket # 27. On April 26, 2007, Plaintiffs' counsel informed Bennett's counsel, for the first time, that she was unable to meet her clients' discovery obligations because Plaintiff Joyce suffered from post-traumatic stress resulting from the events underlying the lawsuit and was unable to participate in discovery. Docket # 23–2, at ¶ 17. Plaintiffs' counsel offered no explanation for her failure to provide Plaintiff Afreedi's discovery responses, nor did she provide any documentation supporting her claim concerning Joyce's inability to participate in discovery. *Id.,* at ¶ 18.

On April 30, 2007, Plaintiffs' counsel served and filed responses to the outstanding discovery requests which were so deficient that they could not fairly be said to constitute answers at all. Docket # s 29–32. For example, the interrogatory answers were not signed by her clients under oath, as required by Fed.R.Civ.P. 33(b)(2). Docket # s 31–32. In responding to the document production requests, Plaintiffs' counsel did not provide even a single document. Docket # s 29–30. In both sets of responses, the Plaintiffs' counsel inter-

posed numerous meritless objections.[1]

After hearing on May 9, 2007, the Court held the motion in abeyance, ordering the Plaintiffs to serve and file discovery responses sufficient under Fed.R.Civ.P. 33 and Fed.R.Civ.P. 34 by May 21, 2007, and to file an opposition in compliance with L.R. 7.1(B)(2) to the motion to dismiss and/or for sanctions by May 18, 2007. The Plaintiffs complied with that Order, and the Defendants have made no subsequent filings alleging that those responses were inadequate. *See* Docket # s 37–40.

*DISCUSSION*

Pursuant to Fed.R.Civ.P. 37(a), a party may, upon reasonable notice to other parties, move for an *order compelling* discovery. Rule 37(1)(2)(A) permits a motion to compel disclosures required by 26(a). Rule 37(1)(2)(B) permits such motions for request made pursuant to Rules 33 (interrogatories) and Rule 34 (Production of Documents). Rule 37(a)(3) provides that an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond.

Fed.R.Civ.P. 37(a)(4)(A) provides that when a motion to compel pursuant to Rule 37(a) is allowed, or when responses are made after a motion has been filed (both of which factors are present in this case):

> ... the court *shall*, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of

them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust. (emphasis added).

Similarly, Fed.R.Civ.P. 37(b)(2) permits additional sanctions for a failure to comply with a Court's order made pursuant to Rule 37(a). Available sanctions include "dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party." Fed.R.Civ.P. 37(b)(2)(C). Dismissal of the action is also available as a sanction for a failure to respond in a timely fashion to interrogatories or requests for production of documents. Fed.R.Civ.P. 37(d).

Bennett's Motion to Compel was allowed as unopposed. However, it is clear that the motion would have been allowed on the merits even had it been opposed. As the recitation above makes clear, the Plaintiffs have violated Fed.R.Civ.P. 26(a), 33 and 34, as well as this Court's Orders of March 22, 2007, and April 13, 2007. Responses to Bennett's Interrogatories and Requests for Production of Documents were to be served on Bennett's counsel by no later than October 30, 2006. Fed.R.Civ.P.

---

1. *e.g.*, when asked to produce "[c]opies of all documents purporting to show the actual and/or potential damage to Plaintiff's potential reputation as alleged in his Complaint," Plaintiff's counsel objected to the request as "overly broad, unduly vague and/or ambiguous," adding "it is impossible to document an intangible such as the damage to Plaintiff Afreedi's professional reputation."; when asked to produce Plaintiffs' tax returns, Plaintiffs' counsel objected (despite assertions in the Complaint of lost income) that the request was "burdensome and oppressive and not calculated to lead to the discovery of admissible evidence"; an interrogatory seeking to discover the names, addresses and phone numbers of witnesses known to the Plaintiffs was answered only with the statement, "Defendant objects to this interrogatory on the grounds that it is overly broad, unduly vague, and ambiguous, burdensome and oppressive."

33(b)(3); Fed.R.Civ.P. 34(b); Fed.R.Civ.P. 6(a). Bennett moved to compel the responses on February 26, 2007, after first making a good faith effort to obtain the disclosure or discovery without court action. The responses were not served until May 21, 2007.[2] Disclosures pursuant to Fed.R.Civ.P. 26(a) were to be served on Bennett's counsel by August 10, 2006, and there is no evidence in the record that the Plaintiffs have made those disclosures to date. Moreover, the Plaintiffs twice failed to serve responses by deadlines established by this Court. The Plaintiffs never sought any extensions of time from Bennett's counsel, nor did they move the Court for extensions of time.

In their amended opposition to the motion to dismiss and for sanctions, the Plaintiffs justify their failure to make responses by stating that Defendant Joyce was unable to assist counsel in responding due to post-traumatic stress. Docket # 34, at 1. No supporting affidavit or other documentation of this claim has been filed. No justification for Defendant Afreedi's failure to respond has been offered (other than an assertion that Afreedi's unsigned interrogatory responses of April 30, 2007, included all information provided to Afreedi by counsel), nor has any justification been offered for counsel's failure to seek extensions from opposing counsel or by motion. *Id.*

*Fees And Costs*

█ The Court finds that Bennett's counsel made a good-faith effort to obtain the discovery without court action, that the Plaintiffs' failure to respond was not substantially justified, and that no circumstances exist which would make an award of expenses unjust. Accordingly, I find that a sanction in the form of fees and

costs is warranted under Fed.R.Civ.P. 37(a)(4)(A), and I award to Bennett's counsel the reasonable expenses incurred in making his motion to compel. Docket # 23–5 details the costs and fees of Bennett's counsel relating to the Motion to Compel. The Court finds that both the hourly rate ($125.00) and the number of hours expended (7.1) are reasonable. As of April 11, 2007, Bennett's counsel had accumulated fees in the amount of $887.50 and costs of $12.32.

Accordingly, the Motion is ALLOWED to the extent it seeks sanctions, and I hereby ORDER Plaintiffs' counsel to pay to Bennett's counsel of record her fees and expenses in the amount of Eight Hundred and Ninety–Nine Dollars and Eighty–Two Cents ($899.82).

*Motion to Dismiss*

█ A district court may dismiss an action for noncompliance with a discovery order. Fed.R.Civ.P. 37(b)(2)(C). *Benitez–Garcia v. Gonzalez–Vega,* 468 F.3d 1, 4 (1st Cir.2006); *See also National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). Rule 37 sanctions are to be applied both to penalize those whose conduct warrants sanction and to deter those who might be tempted to such conduct in the absence of such a deterrent. *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 763–764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) *citing National Hockey League,* 427 U.S. at 643, 96 S.Ct. 2778. However, a case should not be dismissed with prejudice except when a plaintiff's misconduct is particularly egregious or extreme. *Benitez–Garcia,* 468 F.3d at 4, *citing Benjamin v. Aroostook Med. Ctr., Inc.,* 57 F.3d 101, 107 (1st Cir.1995). Dismissal as a sanction

---

**2.** I find that the responses served on April 30, 2007 (which were themselves six months late) were both evasive and incomplete and thus constituted a failure to respond as defined by Fed.R.Civ.P. 37(a)(3).

runs counter to judicial policy favoring the disposition of cases on the merits. *Velazquez–Rivera v. Sea–Land Service, Inc.*, 920 F.2d 1072, 1075–1076 (1st Cir.1990). Accordingly, fairness requires that some limits be placed on the use of that sanction. *Id.*, at 1076. Common considerations in assessing what sanction is appropriate include the severity of the violation, the legitimacy of the party's excuse, repetition of violations, the deliberateness of the misconduct, mitigating excuses, prejudice to the other side and to the operations of the court, and the adequacy of lesser sanctions. *Benitez–Garcia*, 468 F.3d at 5. Disobedience of court orders, in and of itself, has been held to constitute extreme misconduct warranting dismissal as a discovery sanction. *Ortiz–Rivera v. Municipal Government of Toa Alta*, 214 F.R.D. 51, 57 (D.Puerto Rico, 2003) *citing Cosme Nieves v. Deshler*, 826 F.2d 1, 2 (1st Cir. 1987).

██ Dismissal is available as a sanction in this case because the Plaintiffs have twice disobeyed orders of this Court relating to discovery. Nevertheless, although the misconduct of the Plaintiffs and their counsel has been serious, it has not been not sufficiently egregious or extreme to warrant dismissal. The motion is therefore DENIED to the extent that it seeks dismissal.

*CONCLUSION*

For the foregoing reasons, Defendant Bennett's Motion to Dismiss and/or For Sanctions (Docket # 23) is ALLOWED IN PART and DENIED IN PART. The Motion for Sanctions is ALLOWED in that the Court ORDERS the Plaintiffs' counsel to pay the costs and fees of Bennett's counsel resulting from their failure to respond to discovery, in the amount of Eight

Hundred and Ninety–Nine Dollars and Eighty–Two Cents ($899.82). The motion is otherwise DENIED.

August 3, 2007.

*REPORT AND RECOMMENDATION ON DEFENDANT STEVEN DEVLIN'S MOTION FOR SUMMARY JUDGMENT.*

The Plaintiffs, Mohammad Farooq Afreedi and Daniel Lourdusamy Joyce, have brought suit against the Defendants, Steven C. Bennett and Steven Devlin, pursuant to 42 U.S.C., §§ 1981 and 1983, M.G.L. c. 93, § 103, and the Massachusetts Civil Rights Act (MCRA). They have also asserted a state law claim for malicious prosecution. Each claim arises from the arrests of Afreedi and Joyce for the crime of Medicaid Fraud, arrests which the Plaintiffs allege were not supported by probable cause.

In response to an Order of Reference dated November 14, 2006 (Docket # 14), I recommend that Devlin's Motion for Summary Judgment (Docket # 10) be ALLOWED.

I. *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

Except where noted, the following factual information was drawn from the affidavits in support of the search warrants. Both parties submitted these documents to the Court. Afreedi and Joyce are United States citizens of South Asian descent. Docket # 2, at ¶¶ 2–3. Bennett is a Massachusetts State Trooper, and Devlin is the Deputy Director of Investigations with the Massachusetts Attorney General's Medicaid Fraud Control Unit. *Id.*, at ¶ 4; *Bennett Affidavit*, at ¶ 1.[3]

---

**3.** Docket # 12 (*Defendant's Memorandum in Support of Motion for Summary Judgment*) has as its 'Exhibit A,' Bennett's *Application and Affidavit in Support of a Search Warrant,*

On June 14, 2002, the Massachusetts Executive Office of Health and Human Services (HHS) referred two medical laboratories (MD Lab 2000, Inc. and Medix Medical Lab) to the Medicaid Fraud Control Unit for investigation. Docket # 12, Ex. B. HHS indicated to the Medicaid Fraud Control Unit that based upon information provided by its Connecticut counterpart, it believed that these two labs were billing for services they had not performed. *Id.*, at 1. HHS stated that Afreedi was the President of MD Lab 2000, Inc. (MDLAB) and had also been listed as a contact person for a Connecticut lab which had previously engaged in fraudulent activity. It indicated that both MDLAB and Medix had billing patterns similar to the fraudulent Connecticut lab. *Id.* HHS also noted that 933 of the 953 Medicaid participants tested by Medix shared the same diagnosis (malaise and fatigue) and that they were given multiple tests and were tested repeatedly. *Id.*, at 2. With regard to MDLAB, it noted that all of the claims filed were for the same procedure code (single drug screen). *Id.* HHS further stated that it had reviewed twenty-four claims in greater detail, finding that only one of those Medicaid participants had other claims with a drug diagnosis. *Id.* It noted that these patients were tested repeatedly within a short period of time, with lab testing for some patients totaling nearly six thousand dollars. *Id.*

Devlin thereafter commenced an investigation in which he determined that Afreedi and Joyce were the President and Chief Financial Officer, respectively, of MDLAB. Docket # 12, Ex. C; *Bennett Search Warrant Application,* at ¶¶ IV.2, IV.6, IV. 11; *Bennett Affidavit,* at ¶¶ 10, 12, 14. Afreedi and Joyce were the only corporate officers and directors listed on MDLAB's articles of incorporation. *Bennett Affidavit,* at ¶ 12. Afreedi and Joyce were listed among MDLAB's officers/organizers in records related to MDLAB's account with Sovereign Bank. *Bennett Search Warrant Application,* at ¶ IV. 5. Through August 21, 2002, the Massachusetts Division of Medical Assistance (DMA) had made thirty payments to MDLAB totaling $394,787.17. *Id.* at ¶ IV. 1. Bennett examined the front and back of copies of nine of the checks, and each had been endorsed by Joyce and deposited into MDLAB's bank account. *Id.*, at ¶¶ IV.1–2.

Healthcare providers submit claim forms to DMA for reimbursement, which include certifications under the pains and penalties of perjury that the information provided therein is truthful. *Bennett Affidavit,* at ¶ 7; Docket # 33, at Exhibit 6. In the case of laboratories, tests must be medically necessary and must be requested by an authorized provider, in writing. *Bennett Affidavit,* at ¶ 7; 130 C.M.R. 401.416. On claim forms submitted to DMA, MDLAB listed various physicians and health centers as being the providers authorizing laboratory testing.[4] *Id.*, at

which in turn has as its own 'Exhibit A' the *Affidavit of Stephen C. Bennett.* The pagination within is non-consecutive. For convenience, the Court refers to these documents as the *Bennett Search Warrant Application* and *Bennett Affidavit,* respectively, citing to their numbered paragraphs.

4. Defendant's statement of undisputed facts asserts that MDLab listed physicians or health centers on the claim forms as "authorized provider[s]". Def.'s Memo at 4, Undisputed

Fact 4©. Plaintiffs never filed a "concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried," as required by Local Rule 56.1. Indeed, Plaintiffs filed no such statement concise or otherwise. Plaintiffs did include a statement of *undisputed* facts within their memo, however, none of these factual assertions disputed the Defendant's assertion regarding authorized providers. By not controverting the Defendant's factual assertion,

¶ 16. Devlin selected at random 754 of the claims MDLAB had submitted to DMA between June 28, 2002, and August 2, 2002 (over 30% of the total number of all claims submitted by MDLAB, with a value of $122,410.51) and he interviewed the twelve authorizing providers listed by MDLAB for those claims (or their representatives, in the case of institutional providers). *Id.,* at ¶¶ 16–18; Docket # 33, Exhibit 5. Each of the authorizing providers contacted by Devlin stated that he or she (or his or her employer) had never authorized the claims, and that in fact they had never had any dealings at all with MDLAB. *Bennett Affidavit,* at ¶ 16; Docket # 33, Exhibit 5.

For example, MDLAB billed DMA for sixty-five tests with a value of $10,572.62, which it represented were requested by referring physician Dr. Herbert Jordan. Dr. Jordan stated to Devlin that he had never heard of MDLAB, nor had he used or authorized the use of MDLAB for any services. Docket # 33, Exhibit 5, at 5; *Bennett Affidavit,* at ¶ 16©. He added that he knew "of no legitimate reason why they would claim that he referred patients or samples to them for testing." Docket # 33, Exhibit 5, at 5. Dr. Jordan also told Devlin that the only labs he used were two labs located next to his office in Worcester. *Id.*

Similarly, MDLAB billed DMA for ninety-seven tests in the amount of $16,134.27, which it represented were authorized by referring physician Great Brook Valley Health Center (GBVHC). The lab super-

visor of that facility also told Devlin that she had never heard of MDLAB, nor had GBVHC used or authorized the use of MDLAB for any testing. *Bennett Affidavit,* at ¶ 16(d). The lab supervisor told Devlin that GBVHC used only the UMASS Medical Center lab in Worcester. Docket # 33, Exhibit 5, at 8.

MDLAB billed DMA for 189 tests totaling $30,240.91 and listed Family Health and Social Services as the referring provider on the claim forms. Its lab manager told Devlin that she had never heard of MDLAB, nor had the facility ever used or authorized the use of MDLAB for any testing or services. *Bennett Affidavit,* at ¶ 16(g); Docket # 33, Exhibit 5, at 9. Its lab manager told Devlin that it has its own laboratory and that the only lab it used for referral matters was the UMASS Medical Center lab in Worcester. Docket # 33, Exhibit 5, at 9.

Devlin also determined that Afreedi had been observed on Medix's premises, that he was listed as the Medix contact person on both a Department of Public Health (DPH) inspection report and on its Medicare enrollment form, and that he had written a letter to DPH on Medix's letterhead. *Bennett Affidavit,* at ¶¶ 24, 25, 28. Devlin determined that one provider, Family Health and Social Services, was listed by Medix as the authorizing provider for 4,266 lab tests totaling $65,898.92, but a supervisor working for that provider stated to Devlin that it performed its own lab

Plaintiffs are deemed to have admitted it. Local Rule 56.1.

In any event, the claim form includes a field for listing both the name and number of the authorizing provider, denoted as the "Referring Provider." *See* Docket # 33, at Exhibit 6. The Parties have treated the "Referring Provider" listed on the claim form as the authorizing provider contemplated by 130 C.M.R. 401.416. *See, e.g. Plaintiff's Opposi-*

*tion,* Docket # 16, at p. 4 (arguing that the investigation focused upon "authorized providers" with low billings such as Dr. Willard Pitts and Dr. Hari Babu, both of whom are "Referring Providers" on claim forms in Docket # 33, at Exhibit 6). Because the regulations require an authorizing provider as a precondition for reimbursement, I agree that the claim form's "Referring Provider" is the authorizing provider.

tests and did not use outside labs. *Id.,* at ¶ 29.

Bennett sought arrest warrants for Afreedi and Joyce for violation, *inter alia,* of M.G.L. c. 118E, § 40 (*i.e.,* for knowingly and willfully making or causing to be made false statements of a material fact in application for Medicaid benefits), and applied for a search warrant for the search and seizure of MDLAB's business records. The *Bennett Affidavit* submitted in support of the application for the search warrants contains the foregoing detailed information. In support of his *Application for A Criminal Complaint,* Bennett submitted a one-paragraph summary of the foregoing information, stating that he had direct knowledge that twelve different physicians or entities had denied requesting 754 lab tests for which MDLAB sought reimbursement. Docket # 41. The Massachusetts District Court issued the arrest warrants based upon Bennett's application. The next day, on September 24, 2002, Massachusetts Superior Court Justice Christine E. McEvoy approved the search warrants. Afreedi and Joyce were arrested the following day. Over one year later, on October 30, 2003, Massachusetts District Court Justice Robert Brennan found a lack of probable cause to bind the case over to the Superior Court.[5]

On September 22, 2005, Afreedi and Joyce filed this action in the Suffolk Superior Court of the Commonwealth of Massachusetts. Docket # 1–1. Their Complaint brings four claims against each defendant: (1) for violations of the Fourth Amendment to the United States Constitution, brought pursuant to 42 U.S.C., § 1983; (2) for discrimination in the form of interference with the right to make or enforce contracts, brought pursuant to 42 U.S.C., § 1981, or alternatively, pursuant to M.G.L. c. 93, § 103; (3) for violations of the Fourth Amendment to the United States Constitution and/or Article 14 of the Massachusetts Declaration of Rights, brought pursuant to M.G.L. c. 12, § 1 1I; and, (4) for malicious prosecution, brought pursuant to state common law. *Id.* On December 8, 2005, Bennett removed the case to this Court pursuant to 28 U.S.C. § 1441 and § 1446. Docket # 1.

Devlin filed the pending motion on November 9, 2006, asserting that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law because, *inter alia,* the arrests of the Plaintiffs were supported by probable cause, and that even if the arrests lacked probable cause, he is entitled to qualified immunity from civil liability. Docket # 10. In opposition to the Motion, the Plaintiffs filed: a memorandum of law; an *Affidavit of Gladys Quintana;* an *Affidavit of Mohammad Afreedi;* a copy of MassHealth Independent Clinical Laboratory Bulletin 6, dated November, 2001; and, an unauthenticated portion of a transcript of the criminal proceedings. Quintana affirmed that she was an employee of MDLab, and that a Massachusetts State Trooper named Suzanne Snow visited the lab and requested DNA paternity blood testing, and that Quintana informed her that the lab did only urine drug screens. Docket # 12, Exhibit D. Afreedi affirmed: that he was the president of MDLab; that the lab had contracts with various social service agencies to perform lab tests, including the Massachusetts Department of Social Services; that MDLab could not fulfill its contracts after the seizure of its property and the arrests of Joyce and Afreedi; that the lab performed 600 tests monthly and approximately 2,500 tests total; that he worked as a consultant for Medix, but did not give them permission to list him on their licensure application; and that

---

**5.** The record before the Court provides no insight into Judge Brennan's reasoning.

MDLab never billed for a test it did not perform. Docket # 12, Exhibit E.

The motion was heard on April 13, 2007. Following argument, and in response to the Court's Order of April 26, 2007, that he file samples of the claim forms containing the alleged misrepresentations, Devlin filed additional exhibits with an authenticating affidavit. Docket # 33. At the Court's invitation, the Plaintiffs responded with a supplemental memorandum, with an additional affidavit, and further exhibits. Docket # 36. The second *Affidavit of Gladys Quintana* stated that she was an employee of MDLab and that she had had regular contact with the Referral Departments of three institutions who employed specific physicians whom Devlin alleged had denied knowledge of MDLab. Docket # 36-2, at ¶¶ 2-10. She further affirmed that she had personally spoken on 20-30 occasions with Dr. Herbert Jordan, whom Devlin stated had denied knowledge of MDLab, and that records documenting her receipt of authorizations from Jordan were seized and retained by the Commonwealth. *Id.*, at ¶¶ 11-15.

As exhibits to this supplemental filing, the Plaintiffs also attached the following unauthenticated documents:[6] (1) photocopies of various Orders and pleadings from the state court, including Orders directing that certain records seized via the search warrant be returned to the Plaintiffs (Docket # 36-3, at 2-7); (2) a photocopy of a letter from Nancy Pratt, M.D., addressed "to whom it may concern" and requesting a lab test (Docket # 36-3, at 13); (3) photocopies of five documents on MDLab letterhead which the Plaintiffs purport to be requisitions from the University of Massachusetts Medical Center Hospital (Docket # 36-3, at 14-18); (4) a photocopy of a document on MDLab letterhead which the Plaintiffs' memo describes as a requisition signed by Dr. Herbert Jordan, one of the physicians to whom Devlin indicates he spoke and who denied knowledge of MDLab. (Docket # 36-3, at 20); (5) photocopies of documents which the Plaintiff claims are phone messages from "Family Health" and "Family Health Center," another provider whom Devlin alleged denied knowledge of MDLab (Docket # 36-3, at 22-23); (6) photocopies of three documents on MDLab letterhead which the Plaintiffs describe as requisitions from Family Health (Docket # 36-3, at 24-26); and (7) photocopies of two documents on MDLab letterhead which the Plaintiffs describe in their pleading as requisitions from Community Health Link, another provider whom Devlin alleged denied knowledge of MDLab. (Docket # 36-3, at 28-29).

In response to the Court's Electronic Order of July 12, 2007, Devlin filed copies of the arrest and search warrants themselves and of the application for the arrest warrants.[7] Docket # 41. In response, the Plaintiffs filed a second *Affidavit of Mohammad Afreedi* (Docket # 42), in which he describes computer equipment seized

---

6. While these documents are identified and described by counsel within the pleading itself (Docket # 36), they have not been authenticated by a competent affiant in compliance with Fed.R.Civ.P. 56(e). The accompanying *Affidavit of Gladys Quintana* does not reference these documents (rather, Quintana references documents which were "seized ... and are still in the possession of the Attorney General"). At the summary judgment stage, "documents must be authenticated by and attached to an affidavit that meets the re-

quirements of Rule 56(e)." *Carmona v. Toledo,* 215 F.3d 124, 131 (1st Cir.2000). The documents here described are therefore not properly within the summary judgment record.

7. The discussion of the evidence does not distinguish between the information set forth in support of the search warrant and the brief summary of the evidence submitted in support of the arrest warrant at the same time. The Parties drew no such distinction in their

by the Commonwealth pursuant to the search warrant, which has not been returned, with broad descriptions of the categories of information contained therein.

## II. *The Record*

Devlin filed his motion for summary judgment early in the discovery period, without himself conducting any discovery. The Plaintiffs opposed the Motion. They did not file a motion pursuant to Fed. R.Civ.P. 56(f) seeking a continuance of the time to file their opposition for the purpose of taking discovery relevant to their opposition. While the Plaintiffs have indicated in their opposition that business records seized during the search and which were never returned to them would support their position (*see, e.g.,* Docket # 42), they have not, as noted, sought a delay in determination of the summary judgment motion via Rule 56(f) motion and have not filed a motion with this Court seeking to compel the production of the seized records. Nor have the Plaintiffs described the substance of these business records in any detail; rather, they provided the Court only a one sentence summary. Docket # 42. In addition, discovery commenced in 2006 as to defendant Bennett and closed as to fact discovery on July 10, 2007, per the schedule established at the Rule 16 Conference. Thus, Plaintiffs could have supplemented the record with the fruits of any discovery taken. Accordingly, I render a Report and Recommendation based upon the record submitted to the Court by the parties.

## III. *DISCUSSION*

### I. *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to in-terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rogan v. City of Boston,* 267 F.3d 24, 26 (1st Cir.2001) (*citing* Fed.R.Civ.P. 56(c)). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 37 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Moreover, the Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993).

### II. *Probable Cause (Counts I through IV)*

#### a. *Probable Cause Standard*

Each of the claims asserted in the Plaintiffs' Complaint is predicated upon the allegation that Devlin and Bennett lacked probable cause to arrest them for the crime of medicaid fraud. As Plaintiffs' counsel has conceded orally before the Court, a finding that probable cause in fact existed would be fatal to each claim.

■ Under the Fourth Amendment to the Constitution of the United States, the

---

briefing or at argument. Indeed, neither Party submitted (nor objected to the absence of) either the arrest warrants or the applications for same prior to the Court ordering the filing of these documents post-hearing. In any event, the probable cause analysis turns on the totality of facts and information within the officer's knowledge at the time he applied for the arrest and search warrants (*see* discussion at pp. 8 ff., *infra*).

right to be free from unreasonable searches gives rise to a requirement that an arrest be supported by probable cause. *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Probable cause exists where "the facts and circumstances within [the police officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir.1987)(*quoting Beck*, 379 U.S. at 91, 85 S.Ct. 223). "Probable cause determinations are, virtually by definition, preliminary and tentative." *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 11 (1st Cir.2004). The exact degree of certainty required to establish probable cause is difficult to quantify, but it falls somewhere between bare suspicion and what would be needed to justify conviction. *Burke v. Town Of Walpole*, 405 F.3d 66, 80 (1st Cir.2005)(*citing Valente v. Wallace*, 332 F.3d 30, 32 (2003)). Probable cause is evaluated as of the moment an arrest is made, based on the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information. *Beck*, 379 U.S. at 91, 85 S.Ct. 223. Under the so-called "fellow-officer" rule, law enforcement officials cooperating in an investigation are entitled to rely upon one another's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. *United States v. Meade*, 110 F.3d 190, 193 (1st Cir.1997) (*citing United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."). If reasonable grounds

to arrest exist, probable cause is established and there is no constitutional duty to continue to investigate further. *Franco-de Jerez v. Burgos*, 876 F.2d 1038, 1042 (1st Cir.1989).

The standard for probable cause for arrest under Article 14 of the Massachusetts Declaration of Rights mirrors that for the Fourth Amendment to the United States Constitution.[8] *See, e.g., Commonwealth. v. Kotlyarevskiy*, 59 Mass.App.Ct. 240, 243, 794 N.E.2d 1276 (2003); *Commonwealth v. Santaliz*, 413 Mass. 238, 240–241, 596 N.E.2d 337 (1992).

Bennett's *Application for Complaint* (Docket # 41) and *Application and Affidavit in Support of a Search Warrant* (Docket # 12) each state that he believed that Afreedi and Joyce had committed the crimes of causing false Medicaid claims and of conspiracy to commit false Medicaid claims, both in violation of M.G.L. c. 118E, § 40, which provides in relevant part:

> Any person who furnishes items or services for which payment may be made under this chapter, who: (1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under this chapter; or (2) knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment ... shall be punished by a fine of not more than ten thousand dollars, or by imprisonment in the state prison for not more than five years or in a jail or house of correction for not more than two and one-half years, or by both such fine and imprisonment.
>
> *Id.*

Thus, each of the Plaintiffs' claims against Devlin fails if at the moment of

---

**8.** Liability under the MCRA (alleged in Count III of the Complaint) may be predicated upon violations of either the federal or state constitutions.

arrest, he possessed reasonably trustworthy information which was sufficient to warrant a prudent person in believing that Afreedi and Joyce knowingly and willfully had made false statements of material fact (or caused such false statements to be made) on Medicaid claim forms.

Devlin argues that the information available to him as a result of his investigation easily exceeds the probable cause threshold because 130 C.M.R. 401.416 requires that all lab tests must be ordered by an "authorized prescriber," and because every one of the 754 claims of MDLAB reviewed by Devlin listed as authorized prescribers individuals or entities who specifically denied having made such authorizations. Docket # 12, at 11. Alternatively, Devlin argues that even if the probable cause threshold was not met, it was at least arguably met, thus entitling him to qualified immunity. *Id.* at 11–13.

Afreedi and Joyce argue: (1) that the investigation was generally insufficient in depth (for example, they argue that no investigation was made into the nature of Afreedi's relationship to Medix, and that documents obtained via the search warrant could have obviated incriminating evidence obtained previously); (2) that the Defendants' investigation focused on providers who had requested a small number of tests from the labs and were therefore unlikely to remember MDLAB, ignoring those labs which had high volumes; and, (3) that Devlin made false statements concerning Medicaid regulations in an affidavit supporting the search warrant application by misstating the requirements for identification of providers.

b. *Probable Cause for Violation of M.G.L. c. 118E, § 40 Exists Solely on the Basis of Devlin's Interviews of Alleged Authorized Providers*

■ A Massachusetts regulation, 130 C.M.R. 401.416, requires as a condition of reimbursement that all lab tests have been ordered by an authorized prescriber. Thus, the identity of such an authorized provider on a claim form is a material fact within the meaning of M.G.L. c. 118E, § 40. The Plaintiffs have not disputed that the claim forms submitted by MDLAB and reviewed by Devlin each listed individuals and/or institutions as being the authorizing providers for the laboratory tests for which reimbursement was sought. A total of twelve such authorizing providers were listed on the 754 claims reviewed by Devlin (a sample comprising approximately thirty percent of MDLAB's total submissions). Devlin spoke to each of the twelve providers, and they uniformly denied authorizing the tests for which reimbursement was sought and denied having any business relationship with MDLAB. These facts alone are sufficient to warrant a reasonably prudent person in believing that Afreedi and Joyce had caused false statements to be made on Medicaid claim forms. Devlin reasonably concluded on the basis of these interviews that material facts submitted on the claim forms were false. This is especially so given the number of providers with whom he spoke and given the fact that he asked each whether they knew of any legitimate reason why the Plaintiffs referred samples or patients to them for testing and none reported knowing of any such reason. *See* Docket # 33, Exhibit 5.

The affidavits and documents submitted by the Plaintiffs in response to Devlin's post-hearing submissions (in response to the Court's orders of April 26, 2007, and July 12, 2007) do not change the probable cause analysis because they are not materials which were known to Devlin at the time ·the officers applied for the arrest warrants, nor do they raise a genuine issue of material fact regarding what Devlin

knew at the time the warrants were sought.

The Plaintiffs filed an affidavit from Gladys Quintana, an employee of MDLAB. She describes therein both regular contact she had with certain doctors whom Devlin reported had denied knowledge of MDLAB, and describes communication with a specific medical center's referral department through whom she obtained a provider's authorization for tests. Docket 36–2. Afreedi, in an affidavit (Docket # 42), asserts that seized business records would establish that all billed tests were requested and performed. While these facts are indeed relevant to proof of the criminal charges against the Plaintiffs as well as to the question of whether or not MDLAB had the actual authorization required for reimbursement, they are nevertheless not relevant to the probable cause determination, which concerns only the facts and circumstances within Devlin's knowledge at the time he applied for an arrest warrant. *Beck,* 379 U.S. at 91, 85 S.Ct. 223. Devlin did not know of Ms. Quintana, the circumstances she describes or the contents of MDLab's business records.

The Plaintiffs also challenge the sufficiency of the investigation, arguing that the Defendants should have inquired of office or referral managers rather than doctors and should have probed further, with the search warrant or otherwise, before obtaining arrest warrants. Putting aside the fact that in some instances Devlin did speak with office or lab managers rather than doctors, the argument fails. Devlin asserts under oath: "I inquired of each of [the providers] if they, or their facility, had ordered or otherwise authorized MDLAB to perform lab tests or any other kind of services for the patients listed on MDLAB's claim list. Invariably, and in all cases, they denied using MDLAB,

sometimes going so far as to say that they had never even heard of MDLAB." Docket # 33, at ¶ 9. Nothing in the statements from the persons with whom he spoke suggested a need for further inquiry. There is no constitutional duty to investigate further once probable cause exists. *Franco-de Jerez,* 876 F.2d at 1042.

The Plaintiffs' argument that the providers' statements denying referrals to MDLAB may have resulted from the fact that several of the providers contacted had purportedly authorized few tests, or even a single test, is similarly unpersuasive in light of the fact that other providers contacted by Devlin had purportedly authorized dozens (and in some cases, hundreds) of tests. *See, e.g.,* pp. 4–5, *supra; Bennett Affidavit,* at ¶ 18. The sample of authorizing providers contacted by Devlin accounted for more than thirty percent of all of the claims filed by MDLAB.

Nor is the Court persuaded by the argument advanced orally by the Plaintiffs that physicians may not know who actually conducts the tests they have ordered. In addition to interviewing physicians identified by MDLAB as authorizing providers, Devlin, as to some providers, interviewed laboratory managers (the very category of person whom the Plaintiffs identified at oral argument as being in a position to know who conducts such tests), each of whom also denied that their companies had any relationship whatsoever with MDLAB. *Id.;* Docket # 33, Exhibit 5. Several of the laboratory managers told Devlin that they had exclusive relationships with particular laboratories, or did their laboratory work in-house. *See, e.g.,* Docket # 33, Exhibit 5, at 5–9. In addition, for the practices within the UMASS Medical Center umbrella Devlin also spoke with the Director of Compliance/Chief Compliance Officer at the Medical Center. That person reported to Devlin that UMASS medical system

uses the hospital's on-site lab except for certain special tests. The doctor responsible for approving such exceptions told the Compliance Officer no such exceptions were made for routine drug screens (the type of test MDLab performed) and that he had not heard of or approved any tests by MDLab. Docket # 33, Exhibit 5.

The Plaintiffs also assert that probable cause is lacking because Devlin's investigation was "prejudiced" in that he conceded at the probable cause hearing before Judge Brennan that his investigation was looking for a pattern "where the services were in fact not rendered." Docket # 17, at 9–10 (*citing* Exhibit F thereto). This course of action was eminently reasonable in light of the fact that the Commonwealth had specifically requested investigation of MDLAB and Medix by the Medicaid Fraud Unit on this very basis ("... the Division has reason to believe these providers may be billing us for services not provided ..."). Docket # 12, Exhibit B. The Plaintiffs repeatedly assert that MDLAB did not bill for tests that were not performed, and that this is at odds with Bennett's search warrant application and supporting affidavit. *See, e.g., Affidavit of Mohammad Alfreedi,* Docket # 17, Exhibit E, at ¶ 14 ("MDLab never billed for a test that was not performed"). Probable cause for violation of M.G.L. c. 118E, § 40, however, is supported solely on the basis of the denials of authorization by the listed providers, whether or not Devlin believed that tests were being performed. Moreover, the fact that each of the providers contacted denied *any* business relationship with MDLAB also reasonably supports the conclusion that tests were not actually being performed. If the authorizing provider represented in the claim forms had in fact authorized no such testing (as reasonably appeared to Devlin to be the case), it then follows logically that no urine samples attributable to the named

patients had been forwarded to MDLAB by those providers, and thus that no legitimate testing had occurred. Devlin, therefore, could reasonably have concluded on the basis of his interviews with the twelve allegedly authorizing providers that no tests were performed in connection with the sample of 754 claims.

The Plaintiffs also claim that Devlin misrepresented Medicaid requirements in affidavits supporting the search warrant application. Docket # 17, at 3 ("Devlin asserted ... in his application and Affidavit in Support of Application for Search Warrant ... the following"; "Devlin made false statements about the regulations promulgated by [DMA] ..."). The application and supporting affidavit referred to were actually sworn by Defendant Bennett, rather than by Defendant Devlin. Nevertheless, Bennett attributes his knowledge of Medicaid procedures and MDLAB's billings to Devlin. *See, e.g.,* Docket # 10, at Ex. A, at Bates No. 070–072, ¶¶ 6, 8–9.

The Plaintiffs state, "[t]he Search Warrant and Affidavit falsely state that in order to obtain Medicaid reimbursement for urinalysis testing all licensed laboratories are required to submit proof that the testing had been requested by an authorized provider." Docket # 17, at 3, ¶ 4(b). The Plaintiffs provide no citation directing the Court to such a statement in the affidavit, and the Court is unable to locate one. Bennett does state in his affidavit that "... labs may only be reimbursed by Medicaid if ... an authorized provider has requested in writing the lab perform a medically necessary test on a specimen of an eligible Medicaid beneficiary, and the test is actually performed." *Bennett Affidavit,* at ¶ 7 (*citing,* 130 C.M.R. 401.406). Bennett's statement that authorization is required for laboratory testing, however, is merely an accurate recitation of Medicaid

requirements. 130 C.M.R. 401.416 provides that an "independent clinical laboratory may not bill for a service until it has received a written request to perform that specific service from the authorized provider." Bennett never claims in his affidavit, as the Plaintiffs suggest, that proof of such authorization is required on the claim form itself as a matter of law. More importantly, the question of whether such proof is required or not is moot. Bennett's affidavit states that assertions as to the identity of authorized providers *were* in fact made (which the Plaintiffs do not dispute), and, after investigation, these material assertions reasonably appeared to be false.[9]

The Plaintiffs also point to MassHealth Independent Clinical Laboratory Bulletin 6, dating from November, 2001. They characterize that bulletin in their Complaint as "eliminating the requirement for primary care approval of clinical laboratory tests." Docket # 2, at ¶ 17. Docket # 12, Exhibit C. The bulletin in question states that "[c]urrently, when a primary care clinician (PCC) refers a plan member to a specialist who then orders clinical laboratory tests, the laboratory must include the member's PCC referral number on the MassHealth claim form." *Id.* The bulletin then eliminates "the requirement for a PCC referral number on claims for laboratory services provided to MassHealth members enrolled in the PCC Plan." *Id.* Eliminating the requirement that a PCC referral number appear on claims does not eliminate the requirement of authorization for laboratory testing. As already noted, 130 C.M.R. 401.416 clearly provides that an "independent clinical laboratory may not bill for a service until it has received a written request to perform that specific service from the authorized provider." The Court also notes that the bulletin

explicitly covers the situation "when a primary care clinician (PCC) refers a plan member *to a specialist who then orders clinical laboratory tests*" (emphasis added). It thus eliminates the need for reference on the claim form not to the authorizing prescriber, but simply to the PCC who sent the patient to the authorizing provider. The Bulletin is therefore irrelevant to the analysis of the probable cause determination.

Finally, Plaintiffs have not argued directly that Devlin knowingly or recklessly misrepresented the statements he attributed to the twelve providers. Nor have Plaintiffs submitted evidence directly disputing Devlin's report of the statements of the twelve providers. The general statements contained in the Quintana and Afreedi affidavits (Docket # 36–2, 42) that MDLab had authorizations for the tests billed or that MDLab had contact with several of the twelve providers do not create a genuine dispute of material fact concerning whether the providers made the specific statements denying authorization attributed to them in a detailed and specific manner by Devlin. *See, e.g., Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)(general averments are insufficient to meet Rule 56(e)'s requirement that the non-moving party advance specific facts showing that there is a genuine issue for trial. "The object of this provision is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."). Quintana is specific as to one doctor. She does assert that she received authorizations from Dr. Jordan during phone calls with him and that they spoke personally at least twenty to thirty times during Quintana's work form MDLab. Even if that assertion creates a

9. The alleged misrepresentations were not made to the magistrate who issued the arrest warrants, but only to the judge who issued the search warrant.

dispute of fact as to Dr. Jordan's statements, the statements from the other eleven providers establish probable cause. I also note that Defendant asserts as an undisputed fact that the providers denied to the officers authorizing the tests performed by MDLab. Def.'s Memo., Statement of Undisputed Facts at ¶ 4(d) & (f). Plaintiffs cited no evidence in their opposition disputing this factual assertion. See n. 4 *supra.*

### c. *Devlin Possessed Additional Information Supporting Probable Cause for Violation of M.G.L. c. 118E, § 40*

■ Although Devlin's interviews of the physicians and entities listed by MDLAB as authorized providers on the sample of 754 claims he examined was itself sufficient to support probable cause that the Plaintiffs had violated M.G.L. c. 118E, § 40, Devlin nevertheless had additional information available to him supporting the same conclusion. He had been told by an agency of the Commonwealth that Afreedi was connected to a Connecticut lab which had engaged in fraudulent billing in the past. Devlin is entitled to rely upon another investigator's knowledge of facts when forming his conclusion that a suspect has committed or is committing a crime. *United States v. Meade,* 110 F.3d 190, 193 (1st Cir.1997)(*citing United States v. Ventresca,* 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)). Afreedi was also connected by his own physical presence and by documentary evidence (including a letter written by him in which he identified himself as Medix's "Clinical Laboratory Consultant") to another lab, Medix, which Devlin's investigation showed was connected to more than 4,000 apparently fraudulent claims listing just one provider.

■ The existence of probable cause is evaluated as of the moment of arrest, and information only available thereafter is of no relevance. *Beck,* 379 U.S. at 91, 85 S.Ct. 223. Thus, the fact that, ultimately, the charges against the Plaintiffs were dismissed for lack of probable cause, presumably based upon a fuller record than known to the Defendants (particularly where the record in this Court is silent as to the rationale underlying that determination) is immaterial. The same is true of the fact that, as Plaintiff suggests, an examination of the documents seized upon the execution of the search warrant may have tended to exonerate the Plaintiffs.

For the foregoing reasons, Devlin had probable cause to arrest the Plaintiffs for violation of M.G.L. c. 118E, § 40, and I recommend that his Motion for Summary Judgment be ALLOWED.

Regarding Bennett (who has not yet moved for summary judgment), Plaintiffs' counsel has represented orally to the Court that the probable cause determination as to Defendant Devlin also controls as to Defendant Bennett (and that a finding of probable cause defeats all claims in the Plaintiffs' Complaint). Nonetheless, no motion is pending and therefore no action is required at this time.

### III. *Even if Probable Cause Had Been Lacking, Devlin Is Entitled To Qualified Immunity From Suit*[10]

■ The principle of qualified immunity shields a police officer from liability for civil damages when his conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct.

---

**10.** Although the finding of probable cause is itself fatal to each of the Plaintiffs' claims, I will nevertheless proceed to analyze further issues raised by Devlin's motion.

3034, 97 L.Ed.2d 523 (1987). The qualified immunity standard is not a stringent test, and gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law. *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). This protection is afforded to police officers so that they need not always err on the side of caution from fear of being sued. *Id.* Thus, Devlin is entitled to qualified immunity so long as the presence of probable cause is at least arguable. *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034; *Ricci v. Urso,* 974 F.2d 5, 7 (1st Cir.1992). The MCRA affords the same standards of qualified immunity for public officials as does 42 U.S.C., § 1983. *Howcroft v. City of Peabody,* 51 Mass.App.Ct. 573, 595, 747 N.E.2d 729 (2001)(*citing Duarte v. Healy,* 405 Mass. 43, 46–48, 537 N.E.2d 1230 (1989)).

■ The Court has already determined, *supra,* that Devlin had probable cause to arrest the Plaintiffs. Assuming, *arguendo,* that the information he possessed did not upon review rise to a level supporting probable cause, the presence of probable cause was nevertheless at least arguable. This is illustrated by the fact that upon review of the information possessed by Devlin, Massachusetts District and Superior Court judges made findings of probable cause and issued arrest and search warrants, respectively. *See Rodriques v. Furtado,* 950 F.2d 805, 811 (1st Cir.1991) ("Officers performing arrests pursuant to warrants are not absolutely immunized by virtue of an intervening Magistrate's approval, but are entitled to a broad ranging qualified immunity.") The

Supreme Court has stated that where, as here, investigators have obtained a warrant, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... will the shield of immunity be lost." *Malley v. Briggs,* 475 U.S. at 344–345, 106 S.Ct. 1092. There is no credible evidence that Devlin or Bennett engaged in knowing or reckless falsity in preparing the application and affidavit.

### IV. *Additional Bases For Dismissal*

#### a. *42 U.S.C., § 1981 and M.G.L. c. 93, § 103 (Count II)*

In order to prevail on Count II, brought pursuant to 42 U.S.C., § Sec.1981, the Plaintiffs must prove that: (1) they are members of a racial minority; (2) that the defendants discriminated against them on the basis of their race; and, (3) that the discrimination implicated one or more of the activities enumerated in the statute. *Garrett v. Tandy Corp.,* 295 F.3d 94, 98 (1st Cir.2002). In this case, the Plaintiffs allege that the defendants' discrimination interfered with their right to make and enforce contracts, which is one of the activities enumerated in the statute.[11]

■ Plaintiffs are members of a racial minority. The record, however, reflects a complete failure of proof concerning discrimination on the basis of race. The *sole* argument advanced by the Plaintiffs in this regard is that they were arrested without probable cause and that the *only* possible explanation for that occurrence is racial animus. Docket # 17, at 15–16. But probable cause did support their arrest and there is no evidence of discrimination

---

11. Count II also purports to be brought pursuant to M.G.L. c. 93, § 103. That statute provides a cause of action for persons aggrieved by discrimination in contract on the basis of age or handicap. Neither Afreedi nor Joyce has alleged that he is a member of either of these protected groups, and the record contains no evidence suggesting that this statute is applicable to the facts of this case.

by the Defendants against the Plaintiffs on the basis of their race. The element of discriminatory purpose or intent in civil rights claims implies that the defendant selected a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. *Coyne v. City of Somerville*, 972 F.2d 440, 445 (1st Cir.1992)(*quoting Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). Not only do Plaintiffs lack any evidence of discriminatory intent, but the undisputed evidence established that the investigation was initiated at DMA's request. I recommend that Devlin's motion for summary judgment be ALLOWED with respect to Count II both because Devlin had probable cause to seek the Plaintiffs' arrest, and because the Plaintiffs have failed to raise a genuine issue of material fact on the question of discrimination.

### c. *Malicious prosecution (Count IV)*

 To prevail on Count IV, their state law claim for malicious prosecution, the Plaintiffs must establish that: (1) they were damaged because the defendants commenced the criminal prosecution without probable cause; (2) that they did so with malice or improper purpose, and (3) that the criminal action terminated in their favor. *Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 103, 858 N.E.2d 746 (2006). It is undisputed that the prosecution terminated in the Plaintiffs' favor. The claim fails, however, because the Court has found, *supra*, that the arrests were supported by probable cause.

 Even assuming, *arguendo*, a lack of probable cause, the Plaintiffs have also failed to raise a genuine issue of material

fact on the question of malice. To raise a genuine issue of material fact on the question of malice, the plaintiffs must produce evidence that would permit a fact finder to conclude that Devlin (1) knew there was no probable cause, and, (2) that he acted with an improper motive. *Sklar v. Beth Israel Deaconess Medical Center*, 59 Mass.App. Ct. 550, 557, 797 N.E.2d 381 (2003) (*citing Beecy v. Pucciarelli*, 387 Mass. 589, 593–594, 441 N.E.2d 1035 (1982)); *Foley v. Polaroid Corp.*, 400 Mass. 82, 100–101, 508 N.E.2d 72 (1987). Proof of improper motive requires proof that Devlin acted primarily for a purpose other than that of properly carrying out his duties, or was "attempting to achieve an unlawful end or a lawful end through unlawful means," or intended to harass, vex, or annoy the Plaintiffs. *Beecy*, 387 Mass. at 594 n. 9, 441 N.E.2d 1035; *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 273, 571 N.E.2d 1363 (1991). Wanton or negligent behavior is insufficient without some evidence of an ulterior purpose. *O'Connell v. Bank of Boston*, 37 Mass.App. Ct. 416, 420, 640 N.E.2d 513 (1994); *Sklar v. Beth Israel Deaconess Medical Center*, 59 Mass.App.Ct. at 557, 797 N.E.2d 381. The record contains no evidence from which a reasonable fact finder could conclude that Devlin acted with malice. I recommend that Devlin's Motion for Summary Judgment be ALLOWED with respect to Count IV both because Devlin had probable cause to seek the Plaintiffs' arrest, and because the Plaintiffs cannot carry their evidentiary burden on the element of improper motive.

### CONCLUSION

For the foregoing reasons, I recommend that the Court ALLOW Defendant Devlin's Motion for Summary Judgment

(Docket # 10).[12]

August 2, 2007.

12. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Services,* 848 F.2d 271 (1st Cir.1988); *United States v. Emiliano Valencia–Copete,* 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also, Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).